Herman H. KITTS

v.

AMERICAN MUTUAL LIABILITY INSURANCE COMPANY.

Civ. A. No. 2448.

United States District Court
E. D. Tennessee, N. D.

July 25, 1955.

938

Hodges & Doughty, Knoxville, Tenn., for plaintiff.

Clyde W. Key, Knoxville, Tenn., for defendant.

ROBERT L. TAYLOR, District Judge.

This is an action for benefits under the Tennessee Workmen's Compensation Law, Code, sec. 6851 et seq., for permanent total disability or, in the alternative, for such benefits as the proof shows plaintiff entitled to receive. At the time of his accidental injury, plaintiff was employed as a construction foreman for Roehl Construction Company, defendant herein being that company's compensation insurance carrier.

In order to inspect conditions in an unfinished manhole, plaintiff started down the manhole ladder. This ladder was in a fixed position against one side of the manhole, its support being at the top where its curved ends hooked over the manhole rim. When his feet were on the third rung from the top the manhole rim gave way and caused the ladder to drop. From the third rung to the lower end of the ladder the distance was from four to five feet. From the lower end of the ladder to the bottom of the manhole, the distance was an additional three feet. Had plaintiff landed on his feet in an erect position, his fall would have been a distance of between seven and eight feet. However, when the ladder gave way, it threw his body into a diagonal position, so that his body landed against and somewhat across a steam conduit system of one or more pipes which passed through the lower portion of the manhole. The distance of fall of that portion of the body which came in contact with the conduit was somewhat greater than the vertical distance from the position of the third rung to the bottom of the manhole, and because of the narrow space within which plaintiff found himself going down his only means of retarding the force of his fall was by clinging to the ladder, recourse which may have lessened the force of the body contact to some extent. What happened was without warning and under circumstances which made it impossible for plaintiff to condition his body defensively at the point of contact with the conduit.

Immediately following the fall, plaintiff was taken by another employee of the construction company to Dr. Victor Hill, whose examination disclosed that plaintiff had abrasions on the hands and the right lower chest, with reddish discoloration of the latter.

The accident occurred November 3, 1953. On January 27, 1954, plaintiff underwent surgery by which his gall bladder and part of his liver were removed. Within the purview of the compensation law, plaintiff is now disabled from pursuing a gainful occupation in a normal or regular manner. Presented is the primary question of whether there is causal relation between the fall and plaintiff's present disabled condition. Dr. Hill was of the rather positive opinion that no causal relation exists. Dr. Chas. C. Smeltzer who performed the operation of January 27, 1954, was not called as a witness. However, two letters of his were placed in evidence, one dated August 11, 1954, the other, February 7, 1955.

In the first letter it appears that Dr. Smeltzer had only a fragmentary history of plaintiff's accident. As to whether the accidental injury was responsible for

plaintiff's subsequent condition Dr. Smeltzer wrote:

"It is true that gallstones did not result from this injury; however, it is my belief that this man's complications were in a large measure due to his injury to his chest. It is also entirely possible, in my opinion probable, that the acute disease of the gallbladder was initiated by his injury."

In the letter of February 7, 1955, Dr. Smeltzer revised his former opinion and stated:

"A review of all available text books fails to substantiate the fact that acute chloecystitis is caused by trauma. The gallbladder lies shielded underneath the liver in the right center of the body well away from the chest wall, and it would be impossible for direct injury to bruise it in any way. Had the acute chloecystitis come on immediately following a severe injury to the chest, one might have some reason to tie the two directly together; however, the development of this acute chloecystitis according to the substantiated facts in this case show a lapse of over a month from the time of the original injury and the time of hospitalization. It is my opinion that the injury was not responsible for the acute cholecystitis."

This second letter is referred to by its author as a "supplementary report." It consists of three pages, whereas the earlier letter was of one page. The later product belabors the point in question to such extent as to suggest that its author may have received inspiration from a colleague of his profession.

Examination of the proof suggests the source of Dr. Smeltzer's subsequent inspiration. Dr. Hill, as heretofore noted, was of the opinion that no causal relation existed between the accidental injury and the subsequent gall bladder trouble. While Dr. Hill was on the witness stand under cross-examination the two letters of Dr. Smeltzer were put in evidence. With reference to the changed opinion of Dr. Smeltzer, the following colloquy took place between plaintiff's counsel and Dr. Hill:

"Q. You have been pretty active in this case, haven't you? A. I have been active to this extent: I felt that there is some misunderstanding on the part of some of the doctors that was involved in it, and I felt that they should have an understanding of what this was all about. For instance, one of the doctors thought the man was hospitalized in Fort Sanders for an injury. He wasn't hospitalized for injury, that I made clear.

"Q. You were active enough that Dr. Smeltzer changed his opinion in the case between August 11, 1954, and January of this year, weren't you? A. That's right.

    *     *     *     *     *     *

"Q. Why did you become so active in this matter? A. In the first place, I hate to see things like this go on, that is, about misrepresentation, trying to get something that they don't deserve. That is the way it appears to me, not only this case but many of them."

As against the conclusion of lack of causal connection which had its origin in an admittedly unsympathetic viewpoint, other proof is not only less dogmatic but also more restrained and rational. Plaintiff himself has given a history of his condition and its onset that is not in the least rebutted. Prior to his accident he was doing his work without difficulty or evidence of illness. From the moment of his fall he was never well again, and he is not well now. On November 3, 1953, he fell. He was taken to Dr. Hill, who dressed his skinned places and found a reddish discoloration on the lower part of his chest. He worked through Friday, November 6. On Monday of November 9, he had a high fever. On November 10, he consulted his private physician, Dr. A. D. Simmons. His condition then was that of a sick man. However, he returned to work on November 16 after being off from November 10 through

November 15. From November 16 until December 8, he worked intermittently, his position as foreman giving him sufficient freedom of action to favor himself against any exacting duties. His condition meantime had worsened, and on December 8 he was sent by Dr. Hill to Ft. Sanders Hospital for examination and treatment. He stayed in this hospital until December 19, when he returned home.

At home he was confined to his bed with a fever, except for short periods when he could be up and around. Except for brief rallies, his condition grew steadily worse. Early in January, Dr. Simmons made x-ray pictures of plaintiff and found indications of the presence of gall stones. Thereafter plaintiff made an effort to return to work, but because of his acutely worsened condition on January 27, he was taken to St. Mary's hospital where, on that date, he underwent the surgical operation which resulted in removal of the gall bladder and part of the liver.

He remained in St. Mary's hospital, much of the time in an extremely critical condition, until March 13, 1954. Then, after continued illness at home, he returned to St. Mary's on March 29, where he remained until April 3. After this latter stay at the hospital he returned home, where he has had a history of brief employments mainly at odd jobs and at wages greatly below that earned in his former regular employment.

Presently he has a condition which renders him short of breath and which on the last hospital trip required drainage of pus from his pleural cavity. This condition is described as an upthrust of his diaphragm on the right side. Because of changed texture of tissues, the upthrust has become fixed, with the result that his right lung has been crowded upward into a greatly reduced space, with resultant reduction of breathing capacity, weakness and shortness of breath. This is a condition that did not exist prior to his injury. Its cause is not shown, though there are theories which connect it with the diseased condition of the gall bladder and liver inflammation.

Without any medical opinion on the subject, the oft-referred-to rational mind would have no difficulty in perceiving causal connection between the accident and the illness that appeared in its wake. Though the weight of expert opinion is to the effect that the gall stones in a silent or dormant state preexisted the accident, the better medical opinion is that the trauma received by plaintiff could have caused the walls of the gall bladder to sustain injury by being pressed against the stones. Dr. A. D. Simmons testified: "This patient is a rather thin man with stones and it is certainly a possibility that it could have aggravated in a more or less crushing manner if it hit hard enough for these stones to be crushed against the inside walls of the gall bladder."

Plaintiff in testifying described the location of the body blow as just below the edge of his ribs. This would have placed the trauma at a point where there was no rib protection to prevent extension of the blow deeply into the soft inner portions of the body. This positive fact greatly strengthens the opinion of Dr. Simmons that the gall bladder could have been injured.

That several days passed before fever set in is accounted for by medical explanation of the incubation period of infection. An infection, initiated by the blow, would require several days before bacteriological increase would reach the point where toxic results would cause illness and fever. That plaintiff fell on November 3 and was so ill as to require medical attention from Dr. Simmons on November 10 is entirely consistent with the incubation theory.

There is medical testimony that it is "highly probable that he sustained a trauma which activated a latent infective process in his gall bladder."

█ It would serve no useful purpose to further review the evidence. In the Court's opinion, it amply supports a finding of causal relation between the accidental injury and the disability which

plaintiff subsequently sustained. It was the opinion of one doctor that plaintiff is totally and permanently disabled. Evidence, however, that plaintiff had been working at odd jobs, including carpentry work, indicates that he can still work to some extent. Because of weakness and shortness of breath, he cannot work at a steady job where he has little or no freedom as to how much effort he will expend or when he may rest or take time off for recuperation from overexertion.

The Court further finds that as a result of the accidental injuries plaintiff was permanently disabled until September 24, 1954, and that from and after September 24, 1954 until April 23, 1955, he was 80 per cent partially disabled, and from April 23, 1955 he was 75 per cent permanently and partially disabled.

It is immaterial whether the accident initiated the gall bladder trouble or merely aggravated it. The resultant disability is compensable in any event. Ledford v. Miller Bros. Co., Inc., 194 Tenn. 467, 253 S.W.2d 552. Nor is it material that the initial injury may have been small in contrast to the grave consequences which resulted, for the disability is compensable so long as there was causal relation between the initiating accident and the resultant disability. Lester v. Bays Mountain Constr. Co., D.C., 121 F.Supp. 25. In this instance the inception of plaintiff's disease was assignable to accidental origin. Disease so caused is compensable. Morrison v. Tennessee Consol. Coal Co., 162 Tenn. 523, 39 S.W.2d 272. Though the medical opinion is rather generally restricted to such terms as "could" and "possible" in dealing with causal relation between the trauma and the gall bladder trouble, circumstances are not lacking for the inference of reality. Lynch v. La Rue, Tenn.1955, 278 S.W.2d 85. Indeed, the inference of causal relation is much the stronger one and as such, the one that should be adopted. Howell v. Charles H. Bacon Co., D.C., 98 F.Supp. 567.

Plaintiff's hospital and medical expenses to date have been $2,369.92. Plaintiff was 54 years of age at the time of his injury. He was then earning about $120 per week. It had taken 30 years of his life to build his earning capacity to that point. He should have had at least ten more years of generous earnings, with a possibility of several additional years. As a result of the accident, his earnings have been greatly reduced and the prospects are that he will spend the rest of his life in a fight against ill health and poverty. Although the Court is of the opinion that Dr. Hill was conscientious in his views as expressed in his testimony, his attitude toward plaintiff was one that indicated some antagonism. The reason for such antagonism, if sound, and as stated by him, is a legitimate one but the Court is of the opinion that the reason is not supported by the record. He expressed it thus: "I hate to see things like this go on, that is, about misrepresentation, trying to get something they don't deserve."

The spirit behind the compensation law is just the opposite of an unsympathetic attitude. Grudging justice has no place in its administration. Ezell v. Tipton, 150 Tenn. 300, 264 S.W. 355; Moss v. Aluminum Co. of America, 152 Tenn. 249, 276 S.W. 1052; Cherokee Sand Co. v. Green, 152 Tenn. 412, 277 S.W. 905; Cherokee Brick Co. v. Bishop, 156 Tenn. 168, 299 S.W. 770. These are but a few of the many cases which hold that the compensation law should be liberally construed for the benefit of injured employees. Implicit in the law and explicit in the decisions is the principle that industry should take care of its own casualties. Yet even with the best that under the law can be done for this plaintiff, the discrepancy between what he will have gained and what he has lost is rather shocking.

Let an order be prepared and presented.